LEE LIVE STOCK COMMISSION CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 280.   Promulgated June 24, 1927.

1. Upon the evidence *held* that the petitioner is entitled to classification as a personal service corporation.

2. Salaries may not be deducted as expense unless paid or incurred or accrued.

3. Deduction claimed for an alleged bad debt disallowed in absence of proof of worthlessness.

4. Claim for special assessment not considered, the petitioner having been held entitled to classification as a personal service corporation.

*Anan Raymond, Esq.*, for the petitioner.
*John D. Foley, Esq.*, and *L. C. Mitchell, Esq.*, for the respondent.

In this proceeding the petitioner seeks a redetermination of its income and profits-tax liability for the calendar years 1918 and 1919, for which the Commissioner determined deficiencies in the sums of $2,951.78 and $1,308.49, respectively.

The petition alleges three errors on the part of the Commissioner: (1) The denial to the petitioner of classification as a personal service corporation; (2) the disallowance of deductions from income of salaries admittedly neither paid nor authorized during the taxable years; and (3) the disallowance for deduction of an alleged bad debt. In addition to the isues thus raised, the petitioner contends that it is entitled to special assessment, the claim to which has not been heretofore asserted.

FINDINGS OF FACT.

The petitioner, a corporation, is one of 57 or 58 members of the Omaha Live Stock Exchange, a voluntary association organized to regulate and facilitate the sale of live stock at the stock yards at South Omaha, Nebr. All members of the association adhere to and are bound by the rules of the exchange and in general all transact their business in the same way. Some of the member organizations are partnerships and some are corporations. The rules of the exchange are equally applicable to corporations and partnerships.

All firms are what are known as live stock commission firms, and all of them, including the petitioner herein, buy and sell live stock strictly on a commission basis, having themselves no interest whatever in the live stock so bought or sold, their only remuneration or gain as the result of the transactions in which they participate being the commissions earned in their capacity as agents for the owners or purchasers.

It is provided in the rules of the exchange that payments for cattle sold or purchased must be made on the day of sale or purchase if the transaction is consummated before 2 o'clock of that day. If the sale is made after 2 o'clock, the payment is deferred automatically until the following day. In such instances the member organizations frequently advance to the seller of the live stock, by their own check, the amount due him less commissions and other charges incident to the sale. Such amounts so advanced are paid to the firm making the advances not later than the day following the sale, all sales being on the basis of " spot cash," and the 24-hour delay in the case of sales made after 2 o'clock is due only to the rule of the exchange made for its protection in the conduct of its clearing house through which all purchases and sales are cleared and handled.

The stock of the petitioner consisted of shares of the total par value of $7,250. The names of the stockholders, office held by each, and the par value of the stock, are as follows:

Thomas B. Lee, president_____ $2, 000
B. B. Blanchard, secretary_____ 1, 000
Arthur D. Smith, treasurer_____ 4, 250

Lee, the president, was a resident of Kansas City, Mo. He owned an interest in four or five firms engaged in the same business in other cities. During the fall of each year he would spend approximately two months in Omaha, actively participating in the business of the petitioner. It was his practice to make some four or five trips to Omaha during each year to consult with the other stockholders, advise them with reference to the conduct of the business, and familiarize himself with the condition of the business and the market at Omaha. He devoted a considerable amount of time to the other organizations mentioned. It was his practice each year to travel over the country calling upon prospective purchasers and sellers in an effort to induce them to ship their live stock to, or purchase their live stock from, one of the organizations in which he was interested. It frequently happened that live stock consigned to one of these organizations would, because of market conditions, be diverted from the organization to which it was shipped and sold by another of the group operating in a city where the market conditions were more

favorable. So far as the record discloses, no one of the various organizations in which Lee was interested received a preference over the others. It was the practice of the other members of the petitioner corporation to make three or four trips to Kansas City for the purpose of consulting with Lee, procuring his advice, and determining upon the business policy of the petitioner. Both Smith and Blanchard resided at Omaha and devoted their entire time and efforts to the business of the petitioner.

For both of the taxable years the petitioner filed its returns as a personal service corporation. Attached to the return for the year 1919 were the following schedules:

| | |
|---|---:|
| A–3: Commissions on sale of livestock | $49,498.95 |
| A–5: Interest on partners' drawings | 1,386.68 |

A–13:

| | |
|---|---:|
| Insurance | 174.49 |
| Auto up-keep | 119.36 |
| Light | 18.62 |
| Stable | 324.00 |
| Entertaining | 440.55 |
| Professional | 60.00 |
| Rent | 941.10 |
| Ass'n. dues | 119.10 |
| Auto Insurance | 204.42 |
| Adv. & Stationery | 347.99 |
| Trade Journals | 1,493.31 |
| Postage, Tel. & Phone | 1,105.65 |
| Miscellaneous | 327.26 |
| Traveling | 945.07 |
| Exchange | 857.45 |
| Pay Roll | 20,557.96 |
| | 28,036.33 |

A–14:

| | |
|---|---:|
| Thomas B. Lee, Kansas City, Mo., Partial Time | 500.00 |
| Arthur D. Smith, Omaha, Nebr., Entire Time | 6,500.00 |
| Burt B. Blanchard, Omaha, Nebr., Entire Time | 6,500.00 |
| | 13,500.00 |
| A–18: Loss on commissions | 1,345.14 |

A–19:

| | |
|---|---:|
| Depreciation on Autos— | |
| Ford, $490.00, 11½ mos., 25% | 117.00 |
| Dodge, $1,170.00, 1 yr., 25% | 267.75 |
| Ford, $635.55, 3 mos., 25% | 39.72 |
| | 424.47 |

|  | Dec. 31, 1918 | Dec. 31, 1919 |
|---|---|---|
| E. Cash | $535.42 | $3,196.06 |
| Accounts Rec. Trade | 13,150.72 | 23,667.82 |
| Officers | 24,582.22 | 37,730.58 |
| Employees | 1,223.01 | 1,034.70 |
| Notes Rec | 45,104.78 | 37,179.64 |
| Memberships | 6,850.00 | 6,850.00 |
| Liberty Bonds | 3,000.00 | 6,220.00 |
| As-Sar-Ben Stock | | 125.00 |
|  | 94,446.15 | 116,003.80 |
| Bank Over-draft | 12,946.41 | 5,887.81 |
| Acct's Payable, Trade | 5,779.95 | 1,439.27 |
| Officers | 35,884.48 | 44,521.01 |
| Employees | 1,031.14 | |
| Capital Stock | 7,250.00 | 7,250.00 |
| Surplus | 8,240.52 | 14,395.37 |
| Notes Payable | 23,196.27 | 42,510.34 |
| Interest accrued | 117.38 | |
|  | 94,446.15 | 116,003.80 |
| F. Surplus: | | |
| Balance at beginning | | 8,240.52 |
| Profit for year | | 6,154.85 |
|  | | 14,395.37 |

The balance sheet above set forth indicates that the corporation loaned to various individuals substantial amounts of money, and this action by it is one of the reasons assigned by the Commissioner for his disallowance of the claim for classification as a personal service corporation. The petitioner herein had no money of its own to loan. The loans which appear upon the books of the corporation were loans of money belonging to Arthur D. Smith, the treasurer, and his mother, Henrietta I. Smith. These loans were made through the corporation and accounts thereof kept on its books as a matter of convenience and accommodation to Smith and his mother. The corporation over a period of ten years derived a total income from this source of something under $1,200. This amount accumulated as the result of small differences which arose through the making of loans and was permitted by Smith to pass to the credit of the corporation as a compensation for the services of the corporation in providing bookkeeping facilities, etc.

Sometimes Smith found that he was not possessed of sufficient funds to make the loans which he desired and the note of the petitioner endorsed by Smith or his mother was given to the banks in order to secure the additional amounts needed by him, and the credit of the corporation was thus pledged as security for the moneys thus procured for Smith and his mother. The petitioner corporation did not follow the practice of many similar commission houses, of making loans to its patrons, the only loans appearing on its books being those made for and on behalf of Smith and his mother.

The success of a commission house depends to a very large extent upon the individual members thereof each of whom possesses a large number of friends and acquaintances who transact their business with the organization by reason of their friendship for the members and their confidence in the ability and integrity of all the members. The contact of the organization with its patrons is entirely through the members who act in the capacity of agent for the purchaser or seller. During the years in question the petitioner employed three salesmen who were constantly in the yards assisting the members in making the sales or purchases, and who, in the absence of the member, took charge of and handled the business in the yards. Each of these salesmen had friends and acquaintances and each attracted to the petitioner a small amount of business.

In some instances the petitioner, in common with other like organizations, assisted the purchasers of cattle in borrowing sufficient money to make the purchase. This assistance was rendered either by arranging for banks to loan the money directly to the purchaser or by a similar arrangement with the endorsement of the petitioner upon the notes. The notes in every instance where the petitioner's name was endorsed thereon, were secured by a chattel mortgage upon the cattle purchased and the feed which would be required until they were ready for resale. No profit accrued to the petitioner by reason of these financing operations, its only source of income being from commissions and the small amount derived from the service rendered to Smith and his mother.

The salaries authorized and paid to members during the years in question were as follows:

Thomas B. Lee:
    1918 _____ $500
    1919 _____ 500
Arthur D. Smith:
    1918 _____ 5,000
    1919 _____ 6,500
E. B. Blanchard:
    1918 _____ 5,000
    1919 _____ 6,500

In the cases of Smith and Blanchard, the salaries would have been increased had it not been for the belief that the petitioner was entitled to classification as a personal service corporation. Each of these men could have, during the years in question, commanded a salary of $10,000 per year measured by the scale of salaries paid to like organizations for similar services. No salaries were authorized in excess of the amounts paid.

In November of 1919, one Allison, a cattle shipper and a customer of the petitioner, drew a draft upon the petitioner for the sum of

$5,800. The petitioner, believing that Allison had shipped cattle for sale on the Omaha market, honored the draft. Allison had shipped no cattle, and when later one of the representatives of the petitioner called upon him at his home at Hay Springs, Nebr., it was found that the money which he had thus procured had been paid to the bank in that town in satisfaction of his indebtedness to the bank. In May of 1920, Allison executed and delivered to the petitioner a chattel mortgage upon certain live stock and a second mortgage upon 480 acres of land in western Nebraska. The petitioner, in its return for 1919, made no claim for a deduction on account of this transaction with Allison. Some time during the fall or winter of 1920, approximately $200 was realized upon the sale of the cattle covered by the chattel mortgage. In 1924 the second mortgage was sold for $100. During 1919 and subsequent years, Allison was in very straitened financial circumstances. We are unable to ascertain what property he had other than that covered by the mortgages, or whether there was any reasonable prospect of collecting the remainder of the indebtedness.

### OPINION.

GREEN: The respondent opposes the classification of the petitioner as a personal service corporation upon two grounds: First, that capital was a material income-producing factor; and, second, that one of the principal stockholders, namely, Lee, was not regularly engaged in the active conduct of the affairs of the corporation. After a careful examination of all the evidence we are unable to find that the petitioner derived any material amount of income from the use of capital. It does appear that Smith and his mother used the corporation extensively in the conduct of their private loan business. It likewise appears that in some instances they used the credit of the corporation in the furtherance of their private business. But, inasmuch as the corporation derived no profit from the loan business of the Smiths for the use of the corporate credit in that connection, we perceive no reason therein for disallowing the classification. The second objection raised by the Commissioner would seem to have in it some merit. Lee owned approximately 27 per cent of the stock, and by virtue of such ownership must be held to be one of the principal stockholders. We can not from the record determine what proportion of his time Lee devoted to the petitioner corporation. In fact it would appear that an accurate determination of such proportion was well-nigh impossible inasmuch as Lee's activities seemed at all times to be directed towards the building up of all of the businesses in which he was interested, each of which was the commission house and each of which was likely

to receive shipments of live stock from those with whom Lee came in contact. Except when Lee was actually participating in the buying and selling of live stock for one of the other houses at the yards in the city where the house was located, it would seem that he was working for the interest of all, and inasmuch as his activities were constantly producing results for the petitioner as well as the other commission houses, and inasmuch as his efforts were at all times, in part at least, directed towards the upbuilding of the petitioner's business, we are unable to hold that he was not regularly engaged in the active conduct of the affairs of the petitioner corporation, and we therefore conclude that the petitioner is entitled to be classified as a personal service corporation.

The respondent, both in his brief and in his argument, cited the case of *Hubbard-Ragsdale Co.* v. *Dean*, 15 Fed. (2d) 410, in support of his contention that the petitioner was not a personal service corporation. The facts in that case are to be distinguished from the facts in this case in some material respects. In that case the court found that the plaintiff did not render a personal service. Our conclusion, based of course on the record in this proceeding, is just the contrary. There the plaintiff purchased live stock for its customers with its own funds and shipped the live stock to the purchaser, attaching a sight draft for the purchase price to the bill of lading. The petitioner here extended credit to no one except the Smiths, and as the record shows, it earned a negligible income from this source. The court in the *Hubbard-Ragsdale* case, *supra*, based its opinion principally upon a set of facts the parallel of which is not found in this case. It is true that when the petitioner sold cattle (and such sales were all for "spot cash"), it, the same day, gave to the seller its check for the sale price, less commissions, when in some instances, if the sale was made after 2 p. m., it would not collect the purchase price until the next day. We do not regard this as such a use of capital as would warrant us in denying to the petitioner the classification as a personal service corporation. The respondent's contention in this regard was that the loans, above referred to, indicated that capital was a material income-producing factor.

The second allegation of error relates to the disallowance of certain deductions from income to which it is claimed the petitioner is entitled by reason of the fact that the salaries paid by it were smaller than those paid to officers of other corporations rendering a like service and smaller than the petitioner's officers might have obtained from other corporations as compensation for similar services. It is admitted that no such salaries were authorized or paid, and there is no provision of the statute which permits the

deduction of salaries which are neither paid nor incurred, nor accrued.

There seems to be little merit in the petitioner's contention that it is entitled to a deduction in the year 1919 of the amount which it paid out to Allison. The statute requires that the debt be ascertained to be worthless and charged off within the taxable year. The record is entirely silent as to a charge off, and while it does appear that Allison was in straitened financial circumstances, we can not conclude therefrom that the debt was worthless. The petitioner, even as late as 1924, made a collection on this account and there is nothing to indicate that at some time in the future the unpaid balance may not be recovered.

The fourth issue arises out of petitioner's claim that it is entitled to special assessment, and it is unnecessary to give consideration thereto since we have concluded that the petitioner is entitled to classification as a personal service corporation.

> *Judgment will be entered after 15 days' notice, under Rule 50.*